### In re George M. and Lisa COKER, Debtors.

### Bankruptcy No. 97–7111–CMS–13.

United States Bankruptcy Court, N.D. Alabama, Western Division.

Dec. 16, 1997.

---

844

W. Cameron Parsons, Tuscaloosa, AL, for Debtors.

Alan D. Levine, Birmingham, AL, for Creditor.

C. David Cottingham, Tuscaloosa, AL, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

C. MICHAEL STILSON, Bankruptcy Judge.

This matter came before the court on the debtors' motion to use insurance proceeds to substitute a used (1995) Jeep Grand Cherokee Laredo for a wrecked Jeep Grand Cherokee Laredo which had secured the Cokers' auto loan from SouthTrust Bank of Alabama, N.A. SouthTrust orally objected to the motion, contending debtors had no rights in the insurance proceeds and that all the insurance money should go to the creditor. The court has reviewed the record and stipulated facts in the context of applicable law, and finds that SouthTrust's objection is due to be **OVERRULED;** and that the Cokers' motion to substitute collateral is due to be **GRANTED.**

### FINDINGS OF FACT

On August 5, 1996, debtor Lisa Coker executed a **SECURITY AGREEMENT and DISCLOSURE STATEMENT** to Townsend Honda of Tuscaloosa in connection with the credit purchase of a used 1995 Jeep Cherokee, VIN No. 1J4FX58S9SC728386. In the document, Ms. Coker agreed to pay a total $32,016.60 for the vehicle as a "purchase on credit, including your downpayment" at a rate of $533.61 per month for 60 months. The annual interest rate listed in the contract was 13.95 percent, to finance $22,829.07. (*See* SouthTrust's proof of claim # 19 filed in this bankruptcy case on June 24, 1997)

In Paragraph 4 ("**Security Interest**") of the agreement, Ms. Coker granted Townsend Honda a security interest in the Jeep she was buying as well as "all accessions at any time hereafter installed in or affixed to that property, all proceeds of the foregoing, *including the proceeds of all insurance on the foregoing. (All of the property, accessories, accessions and proceeds described above are sometimes referred to in this Note as the 'Collateral').*"

At Paragraph 5. ("**Insurance**"), Ms. Coker agreed to the following:

> You agree to keep the Collateral insured at all times against loss or damage *in an amount not less than the unpaid balance owed under this Note or the fair market value of the Collateral (whichever is less) under a policy naming us as loss payee and providing for payment directly to us in the event of loss or damage of the Collateral.* (emphasis added)

Paragraph 5 granted Ms. Coker the right to choose her own insurance coverage, subject to Townsend's right to reject the insurance before extending credit. This paragraph characterized the insurance as "additional collateral" for SouthTrust.

Counsel for SouthTrust later supplemented the incomplete copy of the security agreement submitted with SouthTrust's proof of claim. The supplement added additional pages to the security agreement. Paragraph 17 ("**Loss or Damage to Collateral.**"), included in the security agreement, provided the following:

> You agree that you will bear at all times the risk of loss of or damage to the Collateral, including theft, collision, or destruction. Your obligations under this Note will not be affected in any way by such loss or damage. In the event any part of the Collateral is lost or damaged, you agree to send us written notice of such loss or damage and of the extent thereof, not later than 10 days after it occurs. *We may, at our election, use the insurance proceeds paid as a result of any loss or damage to the Collateral to repair or replace the Collateral or we may apply such proceeds as a credit or reserve against your obligations under this Note. You hereby appoint us as your attorney-in-fact to file claims under any policy of insurance on the Collateral (but we will not be obligated to file any such claim) and to endorse in your name any check or draft representing proceeds of any insurance covering the Collateral. In the event of a dispute with any insurance carrier regarding coverage or the amount to be paid on account of any loss or damage, we may bring an action or join in any action against the insurance carrier at our election. If we elect not to bring or join any such action and you elect to pursue any claim or action against the insurance company, you agree to do so solely at your expense, and you waive any right to require us to join in the claim or action and any right to charge us with any part of the expenses of the claim or action even if we benefit from it.* (emphasis added)

The certificate of title on the Jeep, listing Lisa G. Coker as owner; SouthTrust Bank of Alabama, N.A., as first lienholder, was issued October 24, 1996. The court assumes SouthTrust is Townsend Honda's assignee, although no written assignment has been submitted.

Ms. Coker selected her own insurer, State Farm Mutual Automobile Insurance Company, as allowed by Paragraph 5 of her contract, but she did not list SouthTrust as loss payee on the policy. Apparently, SouthTrust did not respond by rejecting the policy (as also allowed under Paragraph 5) before extending credit for the Jeep.

The language of Ms. Coker's State Farm policy (copy attached to an unnumbered letter to the Coker file dated August 5, 1997, supplemented by the complete, original insurance policy filed in October, 1997) listed SouthTrust as holding a lien in the vehicle. The policy stated the following in its **FINANCED VEHICLES** section (p. 4):

> If a creditor is shown in the declarations, we *may pay* any comprehensive or collision *loss* to:
>
> 1. *You* and, if unpaid, the repairer; or
>
> 2. *you* and such creditor, as its interest may appear, when we find it is not practical to repair *your car;* or
>
> 3. the creditor, as to its interest, *if your car has been repossessed.* (emphasis added)

The "DECLARATIONS PAGE" of the State Farm policy lists Ms. Coker as "Named Insured". Under "EXCEPTIONS AND ENDORSEMENTS", the first page of the declarations states "FINANCED—SOUTHTRUST BANK, PO BOX 2233, BIRMINGHAM, AL 35201–2233." Elsewhere in **FINANCED VEHICLES,** the policy refers

to "the creditor's interest" in the following way:

The coverage for the creditor's interest only is valid until we terminate it. We will not terminate such coverage because of:

1. any act or negligence of the owner or borrower; or

2. a change in the ownership or interest unknown to us, unless the creditor knew of it and failed to tell us within 10 days; or

3. an error in the description of the vehicle.

The date of termination of the creditor's interest will be at least 10 days after the date we mail the termination notice.

The policy documents did not list SouthTrust as loss payee, sole payee, sole beneficiary or owner of the insurance proceeds. No wording in any of the insurance documents before the court could have operated to convey sole ownership of the insurance proceeds to SouthTrust.

On April 22, 1997, George M. and Lisa Coker filed their bankruptcy petition seeking the protection of a Chapter 13 reorganization plan. In their original schedules, the debtors proposed a value of $18,100.00 for the Jeep and listed the obligation to SouthTrust at $19,500.00. Their plan summary proposed a $411.59 per month payment to SouthTrust at 10 percent to pay the creditor the present value of the $18,100.00 secured interest over the five years of the plan. No motion to value the Jeep, or objection to the claim of SouthTrust was filed by the debtor.

The Cokers proposed to pay secured creditors 100 percent of their allowed secured claims "as determined by the Court"; and to pay unsecured creditors, zero percent.

The court entered an order confirming a Chapter 13 plan for the Cokers June 23, 1997. (BK Doc. 17). In that plan, the Cokers were to pay $600.00 to the trustee semi-monthly to fund their five-year Chapter 13 reorganization. SouthTrust received the proposed $411.59 per month fixed payment

"upon filing a properly perfected proof of claim". Paragraph 5 of that order stated:

The property of the estate shall not vest in the debtor(s) until a discharge is granted under § 1328 or the case is dismissed....

This provision prevents estate property from revesting in the debtor pursuant to 11 U.S.C. § 1327(b) [1] until the debtor completes the confirmed reorganization plan or the bankruptcy case is dismissed. SouthTrust did not object to confirmation of the Cokers' plan nor did it appeal the court's entry of the confirmation order. The bank did not deny that it received appropriate notice of the Coker bankruptcy and of the hearing on confirmation of the Chapter 13 plan.

However, on June 24, 1997, SouthTrust filed a proof of claim for the Jeep debt for a total $23,028.55, with a copy of the title on the Jeep and a partial copy of the security agreement attached. The "Secured Claim" box on the claim form was checked.

On July 2, 1997, the debtors filed this *MOTION TO SUBSTITUTE COLLATERAL.* (BK Doc. 18) The motion stated that the original Jeep Grand Cherokee Laredo VIN No. 1J4FX58S9SC728386, had been wrecked and asked the court to allow substitution of another 1995 Jeep Grand Cherokee Laredo, VIN 1J4FX58S9SC730820 as collateral for the Coker debt to SouthTrust. The motion said that "State Farm Insurance Company has agreed to pay the Debtor $19,940.00 for the total loss of said vehicle." George A Coker's agreement with CRONIC, an auto sales firm with a Griffin, Ga., address, was attached to the motion. Coker agreed to purchase the new 1995 Jeep for a cash price of $18,656.13, total delivery price of $20,000.00 including fees and sales tax. Counsel for the Cokers indicated at the Bankruptcy Court hearing that George M. Coker is now living in Georgia.

SouthTrust was represented by counsel at the hearing on the motion July 29, 1997. At that time, SouthTrust verbally objected to the debtor's proposal to substitute the vehicle for its wrecked collateral. SouthTrust

1. **11 U.S.C. § 1327(b)** provides:
**Effect of confirmation.**
(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation

of a plan vests all of the property of the estate in the debtor.

claimed it owned the insurance proceeds, and that the debtor could not use the funds to purchase a replacement vehicle without SouthTrust's permission. The creditor contended that the debtors had no rights in the proceeds of the insurance policy. South-Trust also indicated at the hearing that it would consent to the substitution if the Cokers purchased the replacement at a South-Trust-approved dealer in Alabama. It was undisputed between the parties that the Coker debt to SouthTrust had exceeded the value of the collateral.

By the day prior to the hearing, the Cokers had made three payments to the trustee to fund their Chapter 13 plan: $700.00 on July 16, 1997; $500.00, June 23, 1997, and $528.00 on May 6, 1997.

The court took the issue of rights in the insurance proceeds under submission for a decision in October of 1997 when the last submission was filed.

## CONCLUSIONS OF LAW

This court has jurisdiction of the Cokers' Chapter 13 bankruptcy case pursuant to 28 U.S.C. § 1334(a). The court has jurisdiction of this contested matter, a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(M) and (O), under 28 U.S.C. § 1334(b). Jurisdiction is delegated by the Standing Order of Reference of the United States District Court, Northern District of Alabama.

### I.

*SouthTrust held a security interest in the Jeep when the Cokers filed bankruptcy and it holds that same security interest in the "cash collateral" represented by the insurance proceeds. No contract document gives SouthTrust a sole ownership of the proceeds.*

The threshold issue in this consideration is whether proceeds from the State Farm in-

surance policy for Lisa Coker's wrecked Jeep are property of her bankruptcy estate or the property of the secured creditor. These issues must be determined in the context of Alabama insurance contract law and federal Bankruptcy Code provisions impacting that state law.

### A. Ms. Coker's bankruptcy estate has rights in insurance proceeds produced by the destruction of estate property.

The court's first inquiry must determine whether, on the day the Cokers filed Bankruptcy, Ms. Coker had rights in the Jeep under her contract with SouthTrust and thus, whether her bankruptcy estate had rights in postpetition damage proceeds under her contract with State Farm. Different legal consequences would follow if the insurance proceeds are not property of the estate.

11 U.S.C. § 541(a)(1)[2] states that filing a bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held: ...". Section 541(a)(6) pulls any *postpetition* "proceeds" "of property of the estate" back into that bankruptcy estate as well. The bankruptcy estate, which arises by operation of law when the bankruptcy petition is filed, is the pool of property interests available to pay off a debtor's creditors or to be used to generate reorganization income to pay creditors.

In cases such as the Cokers, a motion to substitute collateral is actually a motion to use the creditor's "cash collateral" (insurance proceeds in which the creditor holds a lien) to replace a wrecked vehicle with a new vehicle pursuant to 11 U.S.C. §§ 363(b)(1), 363(c)(2) and 363(e). Section 363(a) defines cash collateral to include "*cash equivalents whenever acquired* in which the estate and an entity other than the estate have an inter-

---

**2.** **11 U.S.C. § 541(a) provides in pertinent part:**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. *Such estate is comprised of all the following property, wherever located and by whomever held:*
(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable inter-*

*ests of the debtor in property as of the commencement of the case ....*
(6) *Proceeds,* product, offspring, rents, and or profits of or *from property of the estate,* except such as are earnings from services performed by an individual debtor after the commencement of the case. (emphasis added)

est." (emphasis added)[3] Then, Section 363(b)(1)[4] provides that the "trustee" (generally synonymous with "debtor" in the reorganization chapters) may use property of the estate, including Section 363(a) "cash collateral". Section 363(c)(2) provides the court must approve the substitution where the secured creditor objects. Section 363(e) requires that an objecting creditor's security interest must be adequately protected.

So the proceeds must be defined as property of the estate under Section 541(a) before the court can allow the Cokers to "use" them as cash collateral to replace the Jeep. Conversely, if SouthTrust were the sole owner/beneficiary of the insurance proceeds under the policy, none of the money can be property of the estate and used as cash collateral.

1. *Alabama bankruptcy courts have held that where a secured creditor is "loss payee" under the insurance contract, its right to insurance proceeds is superior to the debtor's rights.*

There have been decisions by bankruptcy courts in the Northern District of Alabama holding that a creditor secured by a debtor's lost or wrecked property had rights in insurance proceeds superior to the debtor's. The courts found that the creditor was the "loss payee" and entitled to first bite of the proceeds.

The Alabama Supreme Court's 1941 *Home Insurance Company of New York v. Tumlin,* 241 Ala. 356, 2 So.2d 435 (1941) is the state law foundation for these bankruptcy court decisions. That case dealt with a creditor specifically named as sole beneficiary in a "loss payable clause" in the policy.

The state Supreme Court construed the *Tumlin* policy to include the following "loss payable clause":

The policy of insurance on which the suit was brought contains the following unequivocal provision as to the payee and the liability of the payor:

'Name of Purchaser Assured James S. Tumlin

Address of Purchaser Guntersville Dam, Ala., Marshall County

and Universal Credit Company. *Loss,* if any, to be adjusted with the purchaser assured, though *to be paid, subject to all the conditions of this insurance only to the Universal Credit Company for the account of all interests.*'

It is apparent from the foregoing that James S. Tumlin and the Universal Credit Company are co-assureds under the policy and bound thereby. *The specific and unequivocal provisions of that contract are that all payments for loss must be* adjusted with the purchaser (Tumlin) and *paid by the insurance company (the Home Ins. Co. of N.Y.) only to the Universal Credit Company (creditor) for the account of all interests.* (emphasis added)

*Tumlin,* 2 So.2d at 436.

The *Tumlin* case discussed the importance of "loss payable clauses" in such insurance contracts prefatory to deciding whether Tumlin could sue the insuror in his own right. Home Insurance had maintained that only Universal Credit could sue, since it was the payee for proceeds in the contract. The Supreme Court overruled a trial court judge who ruled to allow Tumlin's case to be tried by a jury in the absence of Universal Credit as a named party in the lawsuit. The Supreme Court found that because Tumlin offered no proof that Universal's lien had been satisfied, Tumlin failed to show *he* had any beneficial interest in surplus proceeds.

---

**3. 11 U.S.C. § 363(a) provides:**

In this section, *"cash collateral" means* cash, negotiable instruments, documents of title, securities, deposit accounts, or *other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest* and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels,

motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title. (emphasis added)

**4. 11 U.S.C. § 361(b)(1) provides:**

The *trustee, after notice and a hearing, may use,* sell, or lease, other than in the ordinary course of business, *property of the estate.* (emphasis added)

In the course of this conclusion, the Supreme Court quoted its own line of cases to the effect:

> ... the court (the Supreme Court) pointed out that a loss payable clause in a policy gives such *named payee* the superior right to recover, *to the extent of his or her interest shown to the court*, and the assured can only recover any balance in excess. (emphasis added)

*Tumlin*, 2 So.2d at 437.

*See also Smith v. Aetna Insurance Company*, 410 So.2d 11 (Ala.1982) (Court held that mortgagee Smith was specific loss payee under insurance contract and that Aetna had erred by paying property owner/debtor for Hurricane Frederick damage); and *Alabama Farm Bureau Mutual Casualty Insurance Company, Inc. v. Williams*, 530 So.2d 1371 (Ala.1988) (Creditor specifically designated as "loss payee" in insurance contract acquires interest in insurance proceeds to the extent of its outstanding mortgage as of the loss, while property owner/mortgagor acquires only interest in the balance of the proceeds up to policy limit.)

Bankruptcy Judge Cohen's *In re Suter*[5] decision appeared in 1994, holding that AmSouth Bank should receive insurance proceeds from a Chapter 13 debtor's wrecked vehicle. The court found AmSouth was the "loss payee" under the insurance contract and must be allowed to keep a share of insurance proceeds equal to its security interest in the debtor's truck at the time of a wreck. State Farm had paid AmSouth a total $3,245.95 in settlement of the claim for damage. By that point, the debtor had reduced AmSouth's secured claim of $6,425.00, as included in the confirmed Chapter 13 plan, to $2,395.71.

The court denied Suter's request to use the proceeds as cash collateral to buy a replacement vehicle. However, it held that AmSouth's insurable interest was only the $2,395.71 it would lose from destruction of the truck. The court cited *Ala.Code* § 27–14–4(a–c).[6] The debtor, Suter, as the insured, would receive the balance of the award, the court held. It stated:

> Ownership of an insurance policy does not necessarily entail ownership of the proceeds of the policy. Parties may contract that someone other than the policy owner will receive the proceeds of the policy. *The named beneficiary of an insurance policy is the owner of the policy proceeds.* The Supreme Court of Alabama has stated, "A loss payable clause in an insurance policy gives the party named as the one to whom payment is to be made the superior right to recover to the extent of his or her interest, and the assured can only recover any balance in excess." *Home Ins. Co. of New York v. Tumlin*, 241 Ala. 356, 2 So.2d 435 (1941). *Because AmSouth was the loss payee of the insurance policy, the proceeds of the policy are not property of the bankruptcy estate an are payable to AmSouth, at least to the extent of AmSouth's interest in the property insured .* (emphasis added)

*Suter*, 181 B.R. at 119.

The court added, 181 B.R. at 119, n. 3, that:

> The present case may be distinguishable from cases in which the secured creditor only has a security interest in the insurance proceeds and is not a loss payee on the policy, as well as in cases in which the insurance proceeds are payable jointly to the debtor and the secured creditor.

The court stated the following rationale for limiting AmSouth's recovery to the amount of its secured claim rather than allowing it to keep all of the proceeds:

> (b) "Insurable interest" as used in this section, means any actual, lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction or pecuniary damage or impairment.
> (c) The measure of an insurable interest in property is the extent to which the insured might be damnified by loss, injury or impairment thereof. (emphasis added)

---

**5.** 181 B.R. 116 (Bankr.N.D.Ala.1994)

**6.** *Ala.Code* § 27–14–4 provides as follows:

(a) No contract of insurance of property or of any interest in property, or arising from property, shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured as at the time of the loss.

Since the Debtor is the owner of the insurance policy, however, he is entitled to recover the proceeds of the policy which exceed AmSouth's interest in the property insured. Section 506(a) [7] of the Bankruptcy Code provides that a creditor only has a secured claim to the extent of the value of the creditor's interest in the property subject to the creditor's security. Section 506(d) provides that the creditor's lien is void to the extent that it purports to secure a claim which is not an allowed secured claim. Consequently, a creditor's lien is void to the extent it purports to secure an amount which exceeds the value of the property subject to the creditor's security.

*Suter,* 181 B.R. at 119.

*See also In re Shamburger,* 189 B.R. 965(Bankr.N.D.Ala.1996); and *In re Harris,* No. 95–03902–TOM–7, slip op. (Bankr. N.D.Ala. filed Oct. 15, 1996).

In *Shamburger,* Judge Cohen held GMAC, like AmSouth in *Suter,* was loss payee under the policy insuring Shamburger's car. As in *Suter,* the court held GMAC was entitled to the insurance proceeds to the extent of its secured claim; and that the debtor was entitled to the excess.

189 B.R. at 965, n. 2, the court stated:

In *In re Suter* the Court recognized that a different result from the one reached in *In re Suter* may exist where, "insurance proceeds are payable jointly to the debtor and a secured," *id.* at 121, as is the situation in the instant case; however, *the Court recognized that the threshold issue is whether the secured creditor was the loss payee on the insurance policy.* (emphasis added)

Chief Bankruptcy Judge Mitchell also found GMAC to be the loss payee under an insurance contract covering a Chapter 13 (later converted to Chapter 7) debtor's vehicle in the *Harris* case. Harris had listed the debt due to GMAC as $17,000.00 on his schedules; and listed the value of the vehicle at $18,000.00. However, GMAC filed a proof of claim for a secured debt of more than $19,000.00. Harris did not object to the claim. Consequently, the full claim was deemed allowed as secured by operation of law under 11 U.S.C. § 502(a).

The insuror offered a settlement of only $10,900.00 when the vehicle was stolen. Judge Mitchell denied the debtor's motion to use the proceeds to substitute another vehicle as GMAC's collateral. The court found that Harris had no interest in the proceeds since GMAC's right as loss payee was superior and there was no excess above the creditor's allowed secured claim. Since the debtor (and thus the estate) had no interest in the proceeds, the money could not be characterized as Section 3663 cash collateral and the court could not authorize its use in the debtor's reorganization.

In *Carey v. General Motors Acceptance Corporation (In re Carey),* 202 B.R. 796 (Bankr.M.D.Ga.1996), Chief Bankruptcy Judge Hershner interpreted State Farm Mutual Automobile Insurance Company policy provisions *identical* to the pertinent provisions in the State Farm/Coker policy to find that the policy did not make GMAC loss payee on that policy. It held that the insurance proceeds were property of the debtor's bankruptcy estate, and that the creditor held only a security interest in the proceeds, just as it had held a security interest in the wrecked vehicle. Consequently, it granted the debtor's motion to use this cash collateral to purchase a vehicle to substitute for GMAC's wrecked collateral. The court held the replacement lien the debtor offered in the new used vehicle was "adequate protection" for the creditor's security interest.

The Georgia court's interpretation of these policy provisions was critical to the outcome,

---

7. **11 U.S.C. § 506(a) provides:**
  *An allowed claim of a creditor secured by a lien on property in which the estate has an interest,* or that is subject to setoff under section 553 of this title, *is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property,* or to the extent of the amount subject to setoff, as the case may be, *and is an unsecured claim to the extent that the value of* such creditor's interest or the amount so subject to setoff *is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing* on such disposition or use or *on a plan affecting such creditor's interest.* (emphasis added)

since it found that GMAC was not loss payee and thus did not own the proceeds, anymore than it had owned the vehicle. The court cited Judge Cohen's *Suter* case, but distinguished its own case based on the State Farm contract, which it held did not make the creditor loss payee or owner. The court stated:

> Turning to the case at bar, the Court is persuaded that the insurance proceeds are property of Movant's bankruptcy estate. Respondent is a secured creditor with a security interest in the insurance proceeds. The Court has not been provided with evidence that Respondent (GMAC) holds any other interest in the insurance proceeds. Movant's insurance policy provides that payment for a totaled automobile may be made to both Movant (the debtor) and Respondent.

*Carey*, 202 B.R. at 800.

*See also In re Habtemichael*, 190 B.R. 871 (Bankr.W.D.Mo.1996) for the impact of a confirmation order worded differently than the Cokers'. In *Habtemichael*, estate property had revested in debtor after Chapter 13 confirmation under Section 1327(b). Since the debtor's auto was no longer property of the estate, an insurance settlement was not "cash collateral". The court found it could not authorize the debtor's use of the proceeds.

2. *Some other jurisdictions have taken somewhat different views on this issue—particularly where the insurance contract does not make the creditor loss payee; and where a confirmed Chapter 13 plan has already altered the debtor/creditor relationship.*

The Second Circuit Court of Appeals held in 1985 that a debtor's bankruptcy estate had an interest in an insurance draft for repair of a debtor's vehicle where the insurance contract named both the debtor and his credit union as loss payees. In *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512 (1985), the appeals court affirmed the trial court's approval of Bradt's use of the payment to retrieve his car from the repair shop—if he provided the creditor with adequate protection of its security interest pursuant to 11 U.S.C. § 361.

The Second Circuit stated that federal law, rather than state law, determined whether insurance proceeds were proceeds of property of the estate under Section 541(a)(6). The court held that the insurance draft was property of Bradt's estate, but that the credit union's security interest in the car continued in the proceeds under New York's version of the Uniform Commercial Code.

In the *Bradt* case, the debtor had already filed Chapter 7 (later converted to Chapter 13) when his car was damaged. Towne Lincoln–Mercury, which had repaired the car, joined the debtor as plaintiff in his adversary proceeding against the credit union. Bradt and the credit union were both designated as loss payees under his insurance contract. So the insuror issued a draft covering the $4,863.76 repair bill payable to both Bradt and the credit union. When Bradt brought the check to the credit union for its endorsement so he could pay for repairs, "Woodlawn seized the check, cashed it, and refused to release the proceeds." *Bradt*, 757 F.2d at 514.

> "Proceeds" in this context (Section 541(a)(6)) is far less limiting than it is as defined under the Uniform Commercial Code. Proceeds is "intended to be a broad term to encompass all proceeds of property of the estate. The conversion in form of property of the estate does not change its character as property of the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6324. *See* 4 *Collier on Bankruptcy, supra* P 541.19, at 94. Thus, the insurance payment for repairs to an automobile that is property of the estate unquestionably is also property of the estate.

*Bradt*, 757 F.2d at 515.

The Second Circuit ordered the creditor to turn over the draft to the bankruptcy estate. The appeals court found there was no "loss payable" clause in the creditor's favor since both debtor and creditor were payees under the policy.

In *In re Arkell,* 165 B.R. 432 (Bankr. M.D.Tenn.1994), Bankruptcy Judge Lundin, a nationally recognized expert in Chapter 13 law [8], also stated the casualty insurance proceeds from the debtor's car were property of the bankruptcy estate. The court cited the *Bradt* decision for the proposition that:

... casualty insurance proceeds from the destruction of property of a Chapter 13 estate are property of the Chapter 13 estate.

In the *Arkell* case, the court had approved a Chapter 13 plan which valued the creditor's interest in the creditor's original collateral at a present value of $4,500.00, payable at 10 percent interest in monthly installments of $150.00. The plan also provided a 20 percent dividend to unsecured creditors. Nissan Motor Acceptance Corporation's (NMAC) proof of claim stated it was owed $8,565.57. The balance above the plan's $4,500.00 valuation would be considered unsecured. The court pointed out that Nissan had not objected to confirmation of the debtor's plan, or contested the valuation of its collateral.

*Arkell* involved the creditor's motion for relief from stay claiming a security interest in all of $8,225.50 in insurance proceeds. At that point, the debtor's Chapter 13 payments had reduced the $4,500.00 secured portion of the NMAC claim to $1,588.48. NMAC was protesting the debtor's proposal to pay it the remaining $1,588.48 and to use the balance of the insurance settlement to buy a new car. This debtor's insurance contract permitted State Farm to pay a collision loss to NMAC "as its interest may appear." NMAC's interest in the Prism was defined by the confirmation order. After confirmation, this debtor had no obligation to insure NMAC with respect to its *unsecured* claim. In [*First Fidelity Bank v.*] *McAteer,* [985 F.2d 114 (3d Cir.1993)], the bank's contract right against the life insurance company was not limited by the value of its security interest in the truck. Here, after confirmation, NMAC's only right to payment with respect to the car was the present value of $4,500. *If NMAC believed it had an interest in casualty insurance proceeds in excess of $4,500, it had to*

*assert that right at confirmation.* (emphasis added)

*Arkell,* 165 B.R. at 435.

The Tennessee court thus found the undersecured creditor was not due relief from stay; that its interest in the proceeds was a security interest only, set under the confirmed plan; and that insurance proceeds generated postpetition by destruction of property of the estate are likewise property of the estate. The court found NMAC was entitled only to the value of its security interest in the proceeds—the unpaid balance of the secured claim allowed in the confirmation order.

*See Green Tree Financial Corp. v. Garrett (In re Garrett),* 185 B.R. 620 (Bankr.N.D.Ala. 1995) (Court found that debtor's prepetition default on mobile home was not relevant to postpetition request for relief from stay. 11 U.S.C. § 1327(a) confirmation establishes rights of debtor and creditor as those provided in Chapter 13 plan. Debtor was not in default under terms of his Chapter 13 plan.) *See also Woods v. John Fox Oldsmobile, Inc. (In re Woods),* 97 B.R. 850 (Bankr.W.D.Va. 1989) (Creditor whose security interest extends to insurance proceeds is only entitled to adequate protection (replacement lien in substitute vehicle); not to possession of collateral or insurance proceeds.)

**B. Both the Cokers' bankruptcy estate and the creditor have an interest in the proceeds of the insurance policy. However, SouthTrust's interest is a continuation in the Jeep's proceeds of the security interest it held in the Jeep, not sole ownership of this cash collateral.**

█ On August 5, 1996, Lisa Coker signed a security agreement granting SouthTrust's assignor a security interest in the used 1995 Jeep she was purchasing as well as "the proceeds of all insurance on the foregoing." The security agreement itself defined insurance proceeds as "the Collateral" at Paragraph 4. Ms. Coker was listed as owner of the Jeep on its title; SouthTrust as first lienholder ("secured party" in the terminolo-

---

8. Keith M. Lundin, Chapter 13 Bankruptcy, (2d ed.1994).

gy of U.C.C.). On April 22, 1997, when the Cokers filed their Chapter 13 petition, Lisa Coker's ownership of the Jeep became property of the Cokers' bankruptcy estate.

At Paragraph 5, the prepetition security agreement required SouthTrust to be named as loss payee on a policy insuring the Jeep at least for the unpaid balance of the bank's note and "providing for payment directly to us (SouthTrust) in the event of loss or damage of the collateral." That paragraph also granted Ms. Coker the right to select her own insurance coverage—subject to the bank's right to reject the proposed insurance before extending the credit.

Ms. Coker selected her own insurer as allowed by Paragraph 5, but the insurance policy did not designate SouthTrust as loss payee, nor did it provide that proceeds should be paid exclusively to SouthTrust.

The only applicable provision under the insurance policy for paying a creditor secured by the Jeep appeared in the section of the policy designated **FINANCED VEHICLES.** It stated:

> If a creditor is shown in the declarations, we *may pay* any comprehensive or collision *loss* to:
>
> ... 2. *you and such creditor, as its interest may appear,* when we find it is not practical to repair *your car;* ... [9] (emphasis added)

SouthTrust, however, did not reject the policy before extending credit on the Jeep as provided under Paragraph 5 of the security agreement.

*Ala.Code* § 7–9–306(1) and (2) (Alabama's Uniform Commercial Code) identify "[I]nsurance payable by reason of loss or damage to the collateral" as "proceeds" and state that a creditor's security interest in original collateral continues "in any identifiable proceeds" received by the debtor.

The Chapter 13 plan this court approved June 23, 1997 provided for payment of

$411.59 per month to SouthTrust upon the filing of a properly perfected proof of claim. SouthTrust has not contended it failed to receive appropriate notice of the Cokers' proposed treatment of its claim or of the confirmation hearing when the plan was approved. The creditor did not object to the Cokers' confirmation. SouthTrust filed a claim in the amount of $23,028.55 and the debtor has not objected to this claim or moved to value the collateral. SouthTrust therefore has an allowed secured claim in the amount of $23,028.55 to be paid $411.59 per month pursuant to the terms of the confirmation order.

When that unappealed order became final 10 days after its entry, it superseded the old prepetition contractual arrangements between the debtor and SouthTrust. As provided in 11 U.S.C. § 1327(a):

**Effect of confirmation.**

> (a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

The new arrangement between the Cokers and SouthTrust contained no provision granting ownership of insurance proceeds on the Jeep to SouthTrust, or requiring the debtors to provide insurance designating the creditor as sole loss payee of the proceeds. SouthTrust's security interest continues in the $19,940.00 in insurance proceeds to the extent of the value of its security interest—the $23,028.55 allowed secured claim under the Cokers' Chapter 13 plan, reduced by any payments to SouthTrust since confirmation.

Summing up the factual/legal context of the case:

—Ms. Coker specifically granted SouthTrust a security interest in the original Jeep in the security agreement she signed. That security interest was perfected against third parties when the application placing SouthTrust on the certificate of title was delivered

---

**9.** This section also provides State Farm "may pay" "3. *the creditor,* as to its interest, *if your car has been repossessed.*" (emphasis added). The Coker Jeep had not been repossessed at the time the wreck occurred, so this section is not applicable to this dispute.

This **FINANCED VEHICLES** section in Ms. Coker's State Farm policy is identical to that in the **FINANCED VEHICLES** section found in Judge Hershner's *Carey* decision in the Middle District of Georgia. *See Carey,* 202 B.R. at 799.

to the State Department of Revenue, Division of Motor Vehicles in 1996.

—SouthTrust was not designated as loss payee, sole beneficiary or owner of the insurance proceeds in the insurance contract entered between Ms. Coker and State Farm. There was no loss payable clause in SouthTrust's favor in the insurance policy.

—The language of the policy allowed State Farm to choose to pay ("may pay") Coker and SouthTrust jointly if the vehicle were declared beyond repair. At best the debtor and creditor "may" be joint payees contingent on total destruction of the Jeep.

—SouthTrust did not offer to prove, nor is there any evidence to show that the Chapter 13 bankruptcy confirmation order increased its rights to insurance proceeds beyond those provided in Ms. Coker's contract with State Farm.

—In this context, as stated in the *Garrett* case [10], confirmation makes prepetition default, either on payments or on requirements to make creditors insurance loss payees, irrelevant. The old contract and any default are superseded by the new contract—the rights and responsibilities of debtor and creditor in the confirmation order. After confirmation, the only relevant default is default under terms of the confirmed plan. SouthTrust did not argue that the Cokers had defaulted on terms of their reorganization plan.

Based on the following factual and legal findings, the court finds that the Cokers had an ownership interest and SouthTrust had a security interest in the original wrecked Jeep. Ms. Coker's ownership interest became property of her bankruptcy estate on April 22, 1997 when the Cokers filed bankruptcy. The Coker Jeep ownership, subject to SouthTrust's secured claim, remained property of the estate after the June 23, 1997 confirmation by terms of the confirmation order. When the Jeep was wrecked, the insurance proceeds from the casualty also become property of the bankruptcy estate, though still subject to the bank's security interest.

The contract of insurance between Lisa Coker and State Farm also identified South-Trust as secured creditor and possible joint payee, not sole owner, of the proceeds. At most, the language of the policy allows State Farm to issue a check or draft payable jointly to Ms. Coker and to SouthTrust if, as transpired, the Jeep were "totalled."

Alabama's U.C.C. also grants a continuation of such a security interest in any insurance proceeds from destruction of the collateral. Likewise, the Bankruptcy Code specifically identifies insurance proceeds from casualty to property of the estate as "cash collateral."

Under this factual and legal scenario, SouthTrust had no more and no less than a security interest, not ownership, in the wrecked Jeep. It now has no more and no less than a security interest, not ownership, in insurance proceeds which are property of the Coker bankruptcy estate.

The Coker case is readily distinguishable on the facts from Judge Cohen's *Suter* and *Shamburger* decisions, as well as Judge Mitchell's *Harris* opinion. State Farm insurance contract provisions defining South-Trust's interest in the Coker proceeds are identical to the State Farm insurance contract provisions defining GMAC's interest in the *Carey* proceeds in the Georgia bankruptcy court. *See Carey*, 202 B.R. at 799. This court must reach the same result as the Georgia court.

Since the Coker proceeds are property of the estate and cash collateral, the court may authorize the Cokers to use these funds in their financial reorganization if they meet Bankruptcy Code requirements for doing so. SouthTrust's oral objection to the substitution, based on its claim to sole ownership in insurance proceeds must be overruled. The court must at this point determine if the Cokers have proposed adequate protection of SouthTrust's security interest in the meaning of 11 U.S.C. § 361.

*See also Cavalier Insurance Corporation v. Hulsey*, 333 So.2d 594 (Ala.Civ.App.1976) (Bank, which was not designated as loss payee in insurance contract, nevertheless was a proper party in interest in suit over proceeds

10.  185 B.R. 620 (Bankr.N.D.Ala.1995).

since it had a *security interest in the mobile home that continued in insurance proceeds after mobile home burned.*)

## II.

***The Cokers' request to use the State Farm cash collateral must be granted since terms of their confirmed Chapter 13 plan provide adequate protection of SouthTrust's security interest.***

**A. The court may grant a debtor permission to use a creditor's cash collateral pursuant to 11 U.S.C. § 363, so long as the debtor shows that the creditor's security interest is adequately protected.**

■ 11 U.S.C. § 363(c)(2) provides that the Bankruptcy Court may authorize a debtor to use cash collateral despite a creditor's objection "in accordance with the provisions of this section." [11] When a trustee/reorganization debtor requests use of a secured creditor's collateral, he must show the Bankruptcy Court that the creditor's security interest is adequately protected in the meaning of 11 U.S.C. § 361. *See* 11 U.S.C. §§ 363(b)(1), 363(c)(2) and 363(e).[12]

Section 361 sets out three nonexclusive means of providing a secured creditor with adequate protection of its security interest: 1. periodic cash payments; 2. an additional or replacement lien to the extent use of the collateral results in a decrease of the security interest; and 3. other relief constituting the "indubitable equivalent" of the security interest.[13]

Periodic cash payments are the most common ways debtors provide their secured creditors with adequate protection. Replacement or additional liens are also used to achieve adequate protection in many bankruptcy cases.

**B. The Cokers' motion is due to be granted, since the substitution will leave SouthTrust in the same condition it held prior to the wreck—by means of both "periodic cash payments" on its allowed secured debt and a "replacement lien" (security interest) in a 1995 Jeep.**

Before the Cokers' 1995 Jeep was totalled in a wreck, SouthTrust was to receive periodic cash payments of $411.59 per month on a $23,028.55 debt secured by a lien (security interest) in a 1995 Jeep. The bank did not object preconfirmation to this treatment as lacking adequate protection. Neither did it appeal the new relationship between it and the Cokers created in the confirmation order.

The Cokers will continue $411.59 per month fixed payments to SouthTrust on its secured claim and will grant the bank a replacement lien in the substituted Jeep.

---

11. **11 U.S.C. § 363(c)(2)** provides the following: The trustee (debtor) may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
(A) each entity that has an interest in such cash collateral consents; or
(B) *the court,* after notice and a hearing, *authorizes such use,* sale or lease *in accordance with the provisions of this section.* (emphasis added)

12. **11 U.S.C. § 363(e)** provides the following: Notwithstanding any other provision of this section, at any time, *on request of an entity that has an interest in property used,* sold, or leased, *or proposed to be used,* sold, or leased, by the trustee, *the court, with or without a hearing, shall prohibit or condition such use,* sale or lease *as is necessary to provide adequate protection of such interest.* This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362) (emphasis added)

13. **11 U.S.C. § 361** provides the following:

When adequate protection is required under section *362, 363,* or *364* of this title of an interest of an entity in property, *such adequate protection may be provided by —*
(1) requiring the trustee to make a cash payment or *periodic cash payments to such entity,* to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in the property;
(2) providing to such entity an additional or *replacement lien* to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or
(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of *the indubitable equivalent of such entity's interest in such property.* (emphasis added)

The court finds that the periodic cash payments and replacement lien offered South-Trust constitute adequate protection of its security interest.

It appears to the court that the Cokers' proposal will place SouthTrust in the same condition it held before the wreck. Consequently, the Cokers' motion to use the $19,940.00 in cash collateral is due to be granted. SouthTrust's fixed payments of $411.59 per month on a $23,028.55 secured claim will continue and the bank will be granted a replacement lien in the new 1995 Jeep in the amount of the secured claim minus any payments to SouthTrust since confirmation.

## CONCLUSION

Insurance proceeds from the Cokers' wrecked 1995 Jeep are property of their bankruptcy estate and are appropriately considered as cash collateral in the meaning of 11 U.S.C. § 363. Since the Cokers have provided SouthTrust with adequate protection of its security interest in the meaning of 11 U.S.C. § 361, the debtors' motion to use the insurance proceeds to acquire another 1995 Jeep for substitution for SouthTrust's original collateral must be **GRANTED**, contingent on the debtors continuing their monthly payments and granting the bank a replacement lien in the new 1995 Jeep. SouthTrust's objection to use of the cash collateral must be **OVERRULED** since the proceeds are property of the Coker bankruptcy estate and not of the creditor.

An order, consistent with these findings of fact and conclusions of law pursuant to Fed. R.Bank.P. 7052, will be entered separately.