**In re Allan M. VAN STELLE and Karen A. Van Stelle, Debtors.**

**No. HK 05–14152.**

United States Bankruptcy Court, W.D. Michigan.

Oct. 4, 2006.

George T. Perrett, Esq., Parchment, MI, for the Debtors.

David Van Zyl, Esq., Kalamazoo, MI, for the Chapter 13 Trustee.

### OPINION RE: DEBTORS' MOTION TO USE INSURANCE PROCEEDS

JEFFREY R. HUGHES, Bankruptcy Judge.

Allan and Karen Van Stelle filed a petition for relief under Chapter 13 of the Bankruptcy Code on September 27, 2005.[1] Debtors owned a 2004 Chevrolet Malibu when they filed their petition. Debtors had financed the purchase of the Malibu through Chase Automotive Finance ("Chase Automotive"). Debtors' acknowledged in their schedules that they owed $19,564.68 to Chase Automotive on account of this pre-petition indebtedness. They also acknowledged that Chase Automotive had a security interest in the Malibu.

---

1. Debtors' petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), *Pub.L. No. 109–8, § 1501(B)(1)*, 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.

Debtors intended to keep the Malibu as part of their Chapter 13 plan. Their plan bifurcated the debt they owed to Chase Automotive into a secured claim for $9,000 and an unsecured claim for the balance. It then provided for payment of the secured claim in full through the plan. In exchange, Chase Automotive was allowed to retain its lien in the Malibu as security for Debtors' payment of its secured claim.[2]

Debtors continued to use the Malibu during the interval between the commencement of their case and the confirmation of their plan. Unfortunately, the Malibu was involved in an accident during this time. According to Debtors, the insurance company declared the Malibu to be a total loss. The amount of the loss was set at $10,763.

Debtors did not amend their plan to reflect this turn of events. Therefore, the plan that was confirmed at the hearing on January 12, 2006 provided the same treatment for Chase Automotive as had been provided before the accident. That is, Chase Automotive was still to be paid $9,000 as a secured claim. The only difference was that the underlying collateral had transformed from a Malibu into an insurance claim for $10,763.[3]

The insurance company did not tender the settlement check until sometime after Debtors' plan had been confirmed. The check was payable jointly to both Debtors and Chase Automotive. However, the insurance carrier actually delivered the check to the Chapter 13 Trustee and the check has remained with the Chapter 13 Trustee since its delivery to her.

Debtors would like to use the insurance proceeds to purchase a replacement vehicle. However, they have been stymied by the necessity of having to procure Chase Automotive's endorsement of the settlement check. They claim that they have sought Chase Automotive's cooperation but that it has refused. Therefore, they filed a motion with the court on March 21, 2006.

The motion is entitled "Motion to Permit the Debtors to Use Insurance Proceeds for Replacement of Vehicle and for Substituted Collateral." As the title suggests, Debtors propose in their motion that the Chapter 13 Trustee release $9,000 of the insurance proceeds to Debtors and that the Chapter 13 Trustee release the remaining $1,763 to Chase Automotive. Debtors then propose to use their $9,000 to purchase a replacement vehicle in which Chase Automotive is to be given a first lien to collateralize its $9,000 secured claim. Debtors do not specify how Chase Automotive is to use the $1,763 it is to receive although one can surmise that it is to be applied against the $9,000 secured claim. Debtors are also vague as to how the Chapter 13 Trustee is to convert the joint check made payable to Debtors and Chase Automotive into cash so that she can then distribute the amounts proposed.

There have been several hearings regarding Debtors' motion and Debtors have filed two briefs in conjunction with the

2. Debtors' plan also provided that Chase Automotive's unsecured, non-priority deficiency claim would be paid in full along with all other allowed unsecured claims.

3. It does not appear from the record that Chase Automotive objected to confirmation. However, it is unclear whether Chase Automotive was even aware of the post-petition accident and insurance settlement. Again, Debtors owed Chase Automotive $19,564.68. Therefore, one would certainly have expected Chase Automotive to have objected to Debtors' plan to "cram down" its claim had it known that its collateral had transformed from a Malibu into an insurance check and that the amount of that check was $1,763 greater than the value Debtors had ascribed in their plan to the Malibu.

same. Chase Automotive has not appeared at any of the hearings. Nor has Chase Automotive filed any written objection to Debtors' motion. I took the matter under advisement after the last hearing.

## DISCUSSION

The issue presented by Debtors' motion is whether a debtor may, post-confirmation, compel a secured creditor to accept substitute collateral for the property that secured its claim under the terms of Debtors' confirmed plan. There is no question that a debtor may do so with the consent of the secured creditor. However, in this instance, Chase Automotive has not given its consent. Nor am I in a position to conclude that Chase Automotive has given its implicit consent. *See, e.g., In re Roberts,* 249 B.R. 152 (Bankr.W.D.Mich.2000). Indeed, Debtors' motion was filed because Chase Automotive was not willing to give its consent.

■ It is always helpful to begin an analysis of this type by considering what would be the outcome had Debtors not been in a bankruptcy proceeding. Chase Automotive's name presumably appears on the check from Debtors' insurance carrier either because Chase Automotive was named as an additional insured or a loss payee on the policy. In any event, Chase Automotive's lien would have attached to the insurance check even if it was not a payee on that check because the check represented proceeds of its collateral. Mich. Comp. Laws §§ 440.9102(*lll*)(v), 440.9203(6), and 440.9315(b). Debtors have not offered either the security agreement that created Chase Automotive's lien in the Malibu nor any other document to establish what these parties had originally agreed upon as the outcome if the vehicle was destroyed and an insurance check was then issued. Therefore, I must presume that Debtors' contractual arrangement with Chase Automotive requires Debtors to procure Chase Automotive's consent as a pre-condition to using the insurance proceeds as proposed.

■ Bankruptcy can alter what otherwise would be the legal outcome of a matter had the bankruptcy not been commenced. For example, a bankruptcy trustee can utilize Section 365 to cure a pre-petition default under an executory contract even though the bankruptcy trustee, as the debtor's successor in interest, had no right to cure under the contract itself or under applicable non-bankruptcy law. On the other hand, the commencement of a bankruptcy case does not mean that all other laws are irrelevant.

The distorting effect of the Bankruptcy Code upon outcomes which would otherwise be expected outside the context of bankruptcy at times gives bankruptcy law the aura of an "Alice through the Looking Glass" world. The temptation is to treat matters involving a bankruptcy as being governed by a set of rules which bears little resemblance to the rules which govern behavior and relationships when a bankruptcy is not involved. However, bankruptcy proceedings do not transpire in some exotic land which is exempt from the laws which govern the rest of the world. A bankruptcy estate is a legal entity. Like any other legally recognized entity, a bankruptcy estate is capable of owning and conveying property. A bankruptcy estate can enter into binding contracts. A bankruptcy estate can be liable for tortious conduct.

A bankruptcy estate does not engage in these activities in a vacuum. Rather, its activities are proscribed by the very same laws as those which regulate the activities of other legal entities which own property and which engage in business transactions. The only difference

is that the outcome of activities which involve a bankruptcy estate may also be affected by the Bankruptcy Code itself. Consequently, it is incorrect to consider bankruptcy matters as being governed exclusively by the Bankruptcy Code and whatever "common law" the courts may have enacted in conjunction with that Code. Instead, the Bankruptcy Code should be treated as simply a filter which must be used when a bankruptcy petition is filed to reassess an already existing framework of laws and regulations.

*In re Macomb Occupational Health Care, LLC,* 300 B.R. 270, 283 n. 11 (Bankr. E.D.Mich.2003). The question, then, is whether the Bankruptcy Code provides the Debtors in this instance the opportunity to compel Chase Automotive to accept substitute collateral in lieu of receiving the insurance proceeds.

It is very likely that Debtors could have used the Bankruptcy Code to their advantage had they proposed the substitution prior to the confirmation of their plan.[4] For example, Debtors could have modified Chase Automotive's rights under the security agreement to require it to accept the substitute vehicle as its collateral provided that Debtors' treatment of Chase Automotive's secured claim otherwise met the standards for Chapter 13 plan confirmation. 11 U.S.C. §§ 1322(b)(2) and 1325(a)(5).

■ However, a debtor's ability to modify a creditor's rights post-confirmation is limited. *In re Moore,* 247 B.R. 677, 682 (Bankr.W.D.Mich.2000). Section 1322 sets out a long list of provisions that a debtor may include in his or her Chapter 13 plan prior to its confirmation. Indeed, Section 1322(b)(10) expands this list by permitting "any other appropriate provision not inconsistent with this title." However, Section 1329, which governs post-confirmation amendment of a plan, does not permit the same freedom to the debtor. Rather, Section 1329 restricts post-confirmation amendment of a plan to (1) modification of the amount to be paid to a class of creditors; (2) modification of the duration of such payments; and (3) adjustment of a distribution under the plan to account for payments received by a creditor from another source. 11 U.S.C. § 1329(a).

■ Debtors in this instance clearly could modify their confirmed plan under Section 1329(a)(3) to pay off Chase Automotive's $9,000 secured claim with the settlement of their insurance claim. However, Debtors are proposing something quite different, for Debtors want to compel Chase Automotive to give up its lien rights in the insurance proceeds so that they may use the same to purchase a new car. Unfortunately for Debtors, such a plan provision falls outside of the three categories permitted under Section 1329(a). Consequently, Debtors must look elsewhere in the Bankruptcy Code to secure the relief they are requesting.

■ Debtors argue that post-confirmation amendment of their plan is unnecessary because Section 1303 and Section 363(b) give them the authority to force Chase Automotive to accept a substitute

---

4. The question has arisen from time to time as to whether a secured creditor's rights as an additional insured or a loss payee under a policy insuring both the debtor's and its interest in collateral is property of the estate subject to further use by the debtor or whether it simply belongs to the secured creditor under the terms of the insurance contract. Most, but not all, courts have held that the proceeds are property of the estate and, therefore, may be used by the debtor as provided under Section 363 and Section 1303. *See, e.g., In re Carey,* 202 B.R. 796 (Bankr.M.D.Ga.1996) (collecting cases).

vehicle as collateral for its secured claim. Section 1303 provides a Chapter 13 debtor with the same power as a Chapter 13 trustee to use property of the estate under Sections 363(b) and (e).[5] Debtors then cite *In re Young,* No. B–98–51142, 2000 WL 33673801 (Bankr.M.D.N.C. June 21, 2000) and *In re Coker,* 216 B.R. 843 (Bankr. N.D.Ala.1997) for the proposition that Section 363(b) can be used to accomplish the substitution they desire.

[A] motion to substitute collateral is actually a motion to use the creditor's "cash collateral" (insurance proceeds in which the creditor holds a lien) to replace a wrecked vehicle with a new vehicle pursuant to 11 U.S.C. § § 363(b)(1), 363(c)(2) and 363(e). Section 363(a) defines cash collateral to include *"cash equivalents whenever acquired* in which the estate and an entity other than the estate have an interest." Then, Section 363(b)(1) provides that the "trustee" (generally synonymous with "debtor" in the reorganization chapters) may use property of the estate, including § 363(a) "cash collateral" .... Section 363(e) requires that an objection creditor's security interest must be adequately protected.

*Coker,* 216 B.R. at 847–48 (footnote omitted).

■ However, a bankruptcy trustee's authority under Section 363(b) and (e) to substitute a secured creditor's collateral extends only to those instances in which the bankruptcy estate itself has an interest in the subject property.

The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, **property of the estate** ....

11 U.S.C. § 363(b) (emphasis added).

Therefore, Debtors' ability to take advantage of Sections 1303 and 363 turns on whether the insurance proceeds received on account of the wrecked Malibu remained property of the estate subsequent to the January 12, 2006 confirmation of their plan.[6]

There is the preliminary question of whether the insurance proceeds even remained as property of the estate when Debtors' plan was confirmed. Debtors' schedules indicate that the Malibu was in fact titled in Debtor Karen Van Stelle's name and that she claimed the same as exempt pursuant to Section 522(d)(2). Moreover, Trustee did not file an objection to the exemption claimed. Consequently, it would appear that the Malibu ceased being property of the estate on December 4, 2005, which is the 30th day after Debtors' first meeting of creditors had concluded. 11 U.S.C. § 522(*l*) and Fed. R.Bankr.P. 4003(b). *See also, Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992).[7]

---

5. Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(*l*) of this title.

11 U.S.C. § 1303.

6. Neither *Coker* nor *Young* address the specific issue raised in the instant case. In *Coker,* there was no question that the vehicle, which was apparently wrecked post-confirmation, remained property of the estate because the debtor's plan specifically provided that property of the estate was not to vest with the debtor upon confirmation. As for *Young,* the court never had to address the issue because the parties stipulated as part of the debtor's motion that the post-confirmation insurance proceeds from the wrecked vehicle constituted property of the estate.

7. "Appears" is the appropriate word to use under the circumstances, for there are questions regarding Ms. Van Stelle's exemption of her interest in the Malibu. First, Ms. Van Stelle valued her exemption in the Malibu at zero. While I suspect that she did so to

However, even if one assumes that the insurance proceeds continued to be property of the estate through confirmation, Debtors' plan itself provides that the insurance proceeds "vested" in the Debtors at confirmation.

### VESTING OF ESTATE PROPERTY

Upon confirmation of the Plan, all property of the estate shall vest in the Debtor, except for the future earnings of the Debtor and other property specifically devoted to the Plan.

Debtors' 9/27/05 Plan, ¶ I.E.[8]

Indeed, the language chosen by Debtors in their plan simply mirrors similar language in the Bankruptcy Code.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

11 U.S.C. § 1327(b).

Such language certainly suggests that the insurance proceeds stopped being property of the estate when Debtors confirmed their plan and therefore Debtors no longer had the opportunity to take advantage of Section 363(b). However, a number of cases have concluded that the "vesting" contemplated in Section 1327(b) does not result in an absolute conveyance of the bankruptcy estate's property back to the debtor. *See, e.g., Security Bank of Marshalltown, Iowa v. Neiman,* 1 F.3d 687 (8th Cir.1993); *Riddle v. Aneiro (In re Aneiro),* 72 B.R. 424 (Bankr.S.D.Cal.1987); *In re Clark,* 71 B.R. 747 (Bankr.E.D.Pa. 1987); and *In re Fisher,* 198 B.R. 721 (Bankr.N.D.Ill.1996) *rev'd,* 203 B.R. 958 (N.D.Ill.1997) (*Fisher II*). These cases hold instead that the bankruptcy estate retains some interest in the subject property notwithstanding Section 1327(b). Therefore, a more thorough examination of whether Debtors are able to utilize Section 363(b) post-confirmation is warranted.

*Annese v. Kolenda (In re Kolenda),* 212 B.R. 851 (W.D.Mich.1997) is the foremost decision in this district on this issue. The Chapter 13 debtors in *Kolenda* entered into a post-confirmation financing agreement to purchase a new vehicle. The debtors subsequently defaulted and the creditor in turn repossessed the car. The debtors contended that the vehicle was property of the estate and that, therefore, the creditor's repossession of the same was in violation of Section 362's automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

The bankruptcy court agreed with the debtors and the district court, on appeal, affirmed. It concluded that:

"Vesting" may mean more than mere possession without meaning ownership. The term "vesting" is not necessarily synonymous with a transformation of

---

reflect her understanding that Chase Automotive's lien absorbed whatever value the vehicle had, cases such as *In re Heflin,* 215 B.R. 530 (Bankr.W.D.Mich.1997) and *In re Bregni,* 215 B.R. 850 (Bankr.E.D.Mich.1997) would suggest that no exemption was ever claimed by Ms. Van Stelle.

Second, it is unknown whether the insurance company settled the insurance claim before or after the 30–day objection period expired under Fed.R.Bankr.P. 4003(b). If the claim was settled before that date, then it is at least arguable that Ms. Van Stelle was required to amend her Schedule C to reflect this change before she could claim as exempt her interest in the resulting insurance check.

**8.** The plan is otherwise silent with respect to the insurance proceeds. As already discussed, Debtors did not adjust their plan to reflect the fact that the Malibu had been totaled prior to confirmation. As for the Malibu itself, the plan includes no provision for the bankruptcy estate's retention of that vehicle. The plan simply provides for the continuation of Chase Automotive's lien in the Malibu as collateral for its allowed secured claim.

the estate property into property of the debtor. Vesting instead has the ordinary meaning of conveying some immediate right in property. Black's Law Dictionary 1401 (5th ed.1979) ("vest" is defined as "to give an immediate fixed right of present or future enjoyment.... To clothe with possession."). One could understand the term to return to the debtor something more than possession—i.e., full ownership rights in the property except vis-a-vis the interest of the estate in fulfilling the plan.

*Kolenda,* 212 B.R. at 854 (citations omitted).

However, the court in *Kolenda* did not arrive at this conclusion easily. It observed that many courts had been perplexed by the apparent conflict between Section 1327(b), which provides for the "vesting" of property of the estate with the debtor upon confirmation, and Section 1306(a), which nonetheless provides that property of the estate includes not only the pre-petition property of the debtor as provided under Section 541(a)(1), but also all property of the debtor, including earnings, acquired "after the commencement of the case but before the case is closed, dismissed, or converted...." 11 U.S.C. § 1306(a)(1). The court in *Kolenda* then observed that the courts' attempts to reconcile these two provisions, which it agreed were not "models of clarity," had resulted in three different approaches. After discussing each, *Kolenda* adopted the approach whereby "vesting under section 1327(b) is understood to remove no property from the estate." *Kolenda,* 212 B.R. at 853. This approach has become known as the "estate preservation" approach.

Whether I am bound by *Kolenda* is debatable. *First of America Bank v. Gaylor (In re Gaylor),* 123 B.R. 236, 241 (Bankr. E.D.Mich.1991). However, I need not address that issue in this instance because *Kolenda* is clearly distinguishable on the facts. *Kolenda* involved property that the debtor had acquired post-confirmation whereas the property in this instance had been acquired by Debtors before confirmation of their plan. Indeed, the *Kolenda* court itself recognized this distinction.

I therefore conclude that even if the property in the estate at the time of confirmation is transferred to the debtor under § 1327(b), the estate continues to exist, and property acquired post-confirmation is added to the estate until the case is "closed, dismissed, or converted." *Fisher II,* 203 B.R. at 962. As a result, the car at issue, which was acquired post-confirmation, was property of the estate at the time appellant repossessed it. Accordingly, appellant's actions violated the automatic stay provision and subjected appellant to the sanctions of the bankruptcy court.

*Kolenda,* 212 B.R. at 855.

Therefore, *Kolenda's* effort to define "vesting" under Section 1327(b) and its general adoption of the "estate preservation" approach is nothing more than dictum. Nonetheless, *Kolenda* does cite with approval *Aneiro, Fisher,* and *Security Bank of Marshalltown.* Consequently, it is appropriate to consider the merits of each of these cases.

*Riddle v. Aneiro (In re Aneiro),* 72 B.R. 424 (Bankr.S.D.Cal.1987) involved a debtor's pre-petition leasehold interest in some commercial property which then was assumed as part of the debtor's Chapter 13 plan. The landlord thereafter attempted to secure relief from the automatic stay to enforce the lease based upon the debtor's default of a post-confirmation amendment of that lease. The debtor countered by arguing that the lease was invalid. The debtor based his argument on the theory that the leasehold interest remained prop-

erty of the bankruptcy estate post-confirmation notwithstanding Section 1327(b). Therefore, the debtor reasoned, the post-confirmation amendment of the underlying lease was unenforceable because authority to enter into the modification had not been procured pursuant to Section 363(b).[9]

The court in *Aneiro* agreed with the debtor. However, its reasoning is suspect. *Aneiro* acknowledged that the leasehold interest had revested in the debtor upon confirmation of his plan.[10] Nonetheless, the court concluded that the revesting under Section 1327(b) did not in fact transform what had been property of the estate pre-confirmation into property of the debtor post-confirmation.

> The mere revesting of the property in the debtor upon Chapter 13 plan confirmation does not convert property of the estate into property of the debtor. Instead, the revested property remains property of the estate subject to the terms of the order of confirmation and all the protections of § 362(a). While the debtor may own and possess the property of the estate, he is not free for all purposes to do with it as he pleases.

*Id.* at 429.

In other words, *Aneiro* stands for the proposition that both the bankruptcy estate and the debtor can own the same interest in property at the same time. The problems posed by such reasoning are obvious. For example, assume that a debtor's bankruptcy estate included an unencumbered home worth $100,000 that vested to the debtor upon confirmation. According to *Aneiro*, that vesting would result in not only the debtor retaining the

possession of that home but also regaining title. Yet *Aneiro* would also recognize that the home remains property of the estate and, therefore, subject to the Chapter 13 trustee's separate power to convey title to the home. What is a poor purchaser to do? Negotiate with the debtor, the Chapter 13 trustee, or both?

Key to *Aneiro's* analysis was legislative history comparing Section 1227 under the then recently enacted Chapter 12 with the comparable Section 1327 under Chapter 13.

> The Conferees are concerned that farmers be able to obtain post confirmation credit. The Conferees are in agreement that current law allows Chapter 13 debtors to do so. Because section 1227 is modeled after section 1327, family farmers may provide in their plans for post-confirmation financing secured by assets that have revested in the debtor. The debtor may also use revested property to the extent it is not encumbered by the plan or order of confirmation to secure post-confirmation credit. (Conference Report 99–958, pp. 50, 51; also appearing in 132 Cong.Rec. H 8999 (Oct. 2, 1986), U.S.Code Cong. & Admin.News 1986, pp. 5227, 5251, 5252.)
>
> From the foregoing language, it is clear that Congress believes that under § 1327(b), upon confirmation there remains property of the estate which revests in the debtor encumbered by the order of confirmation.

*Id.* at 430.

I question whether a congressional comment made six years after the enactment of Section 1327 has much relevance to the

---

9.  The trustee, after notice and a hearing, may use, sell or lease ... **property of the estate.** 11 U.S.C. § 363(b) (emphasis added).

10.  It is unclear from *Aneiro* whether the debtor's confirmed plan actually contained any

language concerning the status of the bankruptcy estate's property upon confirmation. However, it appears from the context of *Aneiro* that the plan was silent and that therefore Section 1327(b) controlled.

interpretation of that section. In any event, the comment relied upon is unremarkable. It does not, as *Aneiro* would have it, support the proposition that a bare bones confirmation order would in and of itself preclude property of the estate from otherwise transferring back to the debtor upon confirmation of that debtor's plan. Rather, it simply reinforces what is obvious from a casual reading of either Sections 1227(b) or 1327(b): that the absolute transfer otherwise contemplated by these sections can be restricted, or, as the conferees would have it, encumbered by the debtor's plan or by the confirmation order itself.

*Aneiro* also concluded that Section 1306(a) alone dictates when:

> [p]roperty is or is not property of the estate. The relevant events in this determination are commencement of the case and either dismissal, closing or conversion of the case. If Congress had intended for confirmation to so drastically affect the expansive definition of property of the estate found in § 1306, it knew how to draft such a provision.

*Id.* at 429.

However, as the court observed in *In re Walker*, 84 B.R. 888 (Bankr.D.C.1988), Section 1306, like Section 541, answers only the question of what property is to become part of the bankruptcy estate. In other words, Section 541, as complemented by Section 1306, addresses only the "intake" side of the bankruptcy estate. Other sections of the Bankruptcy Code set forth how property, once acquired by the bankruptcy estate, can then be removed from the estate. For example, in a typical Chapter 7 proceeding, property that has become property of the estate by operation of Section 541 may then be removed from the estate through exemption, 11 U.S.C. § 522(1), sale, 11 U.S.C. § 363(b) or (c), distribution, 11 U.S.C. § 726(a), or abandonment, 11 U.S.C. §§ 554(a) and (c). Section 1327(b) is simply another one of the bankruptcy sections that addresses the disposition of estate assets in the context of a Chapter 13 proceeding.

Consequently, Section 1327(b) is very relevant "to whether property is or is not property of the estate." *Aneiro*, at 429. Section 1306 certainly provides that after-acquired property of the debtor is also to become property of the estate in a Chapter 13 proceeding. However, Section 1327(b) stands on the same footing as those other provisions of the Bankruptcy Code that establish how property of the estate, once acquired, is to be later released. Specifically, Section 1327 dictates what property will be reconveyed to the Chapter 13 debtor and what property will remain with the bankruptcy estate at the critical juncture of plan confirmation.

However, the most troubling aspect of *Aneiro* is that it ignores altogether the fact that the concept of vesting arises elsewhere in the Bankruptcy Code. For example, Section 349 provides that dismissal of a bankruptcy case:

> ... revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case....

11 U.S.C. § 349(b)(3).

If a bankruptcy estate is created each time a bankruptcy case is commenced, then that same estate must cease to exist when the case is dismissed. Similarly, it stands to reason that if all of the debtor's interests in property become property of the estate upon the commencement of a bankruptcy case, then those very same interests must go somewhere upon dismissal since there would no longer be a bankruptcy estate to serve as a repository. Consequently, "revest" under Section 349(b)(3) must mean the absolute transfer

out of the estate of whatever interests which become property of the bankruptcy estate by operation of Section 541 or, in this instance, Section 1306. Otherwise, Section 349(b)(3) would be nonsensical.

Congress also used the concept of vesting to describe one of the exceptions to the automatic stay under Section 362(b).

> The filing of a petition ... does not operate as a stay—
>
>> (9) under subsection (a), of—
>>
>>> (D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

11 U.S.C. § 362(b)(9)(D) (emphasis added).

Can the meaning of "vest" be any clearer? The purpose of the parenthetical clause in Section 362(b)(9)(D) is to establish the point in time when a tax lien that is assessed post-petition may attach against property owned by the bankruptcy estate. That point is when the property once again is owned by the debtor. Congress, in expressing this concept, chose the word "transferred" to cover those instances where the change of ownership is accomplished by an actual activity. Congress then chose the word "revest" to address those other instances where a change of ownership might occur, for example, simply by the passage of time or by the operation of law.[11] Nothing about either the word "transfer" or "revest" as used in this section even remotely suggests that the change in ownership contemplated involves something less than an absolute and unconditional conveyance of the subject property from the bankruptcy estate to the debtor.[12]

It is presumed that a word or phrase is to have the same meaning throughout a statutory enactment if it appears more than once. *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990). *Aneiro* is ultimately unpersuasive because it fails to offer any explanation as to why Congress might have intended "vests" as used in Section 1327(b) to mean something short of an absolute transfer of the bankruptcy estate's interest in property when Congress so clearly intended "vests" to have exactly that meaning when used elsewhere in the Bankruptcy Code.

*In re Fisher,* 198 B.R. 721, is the second case cited by the court in *Kolenda.* The Chapter 13 debtor in *Fisher* had amassed a number of post-confirmation parking

---

**11.** Congress, of course, could have used one word instead of two by simply relying upon "revest" to include the different types of transfers involved, However, as the Supreme Court recently observed, redundancy is not necessarily fatal. *Marshall v. Marshall,* 547 U.S. 293, ——, 126 S.Ct. 1735, 1748, 164 L.Ed.2d 480 (2006) ("True, that reading renders the first-quoted passage in part redundant, but redundancy in this context, we no doubt, is preferable to incoherence.").

**12.** The adjective form of vest also appears in Section 363.

> (g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

11 U.S.C. § 363(g).

In this context, vest clearly means unqualified or non-contingent given that it is juxtaposed with the word "contingent." Such a meaning is consonant with how Congress has used vest elsewhere in the Bankruptcy Code as a verb.

tickets on a car which had been property of the estate but which had revested to her upon confirmation by operation of Section 1327(b). The City of Chicago's efforts to enforce these citations culminated in her car being seized, crushed and presumably sold for scrap. The debtor then brought an action for damages against the city on the theory that it had violated the automatic stay. The city countered by contending that the automatic stay had terminated when the car revested with the debtor upon confirmation.

The bankruptcy court in *Fisher* found that the city had violated the automatic stay because the debtor's car remained property of the estate post-confirmation notwithstanding Section 1327(b). However, *Fisher* did not adopt *Aneiro's* reasoning to arrive at this conclusion. Indeed, *Fisher* rejected all attempts, including *Aneiro's*, to reconcile Section 1306(a) and 1327(b).

> As some decisions have noted, the statutory provisions bearing on the extent of the postconfirmation Chapter 13 estate are not consistent. *See, e.g., In re Lee,* 162 B.R. 217, 224 (D.Minn.1993) ("The Bankruptcy Code's provisions on the vesting of property in Chapter 13 cases appear to be somewhat contradictory."). In fact, the contradictions in the relevant provisions of the Bankruptcy Code are so profound that no purely semantic argument yields a satisfactory resolution to the question.

*Fisher,* 198 B.R. at 725.

*Fisher* instead seized upon the supposed contradiction of these two sections as justification for fashioning its own outcome based upon what it perceived as the underlying "purpose served by property of the estate in Chapter 13." *Id.* at 728. The bankruptcy court concluded that pre-confirmation property of the estate had to continue as property of the estate post-

confirmation notwithstanding the apparently contradictory language of Section 1327(b) in order to preserve these assets as a reserve source of payment for creditors in the event the Chapter 13 debtor ultimately elected to convert his case to a Chapter 7 liquidation. *Id.* at 731–32. Consequently, the bankruptcy court in *Fisher* reasoned that "vest" as used in Section 1327(b) had to mean a transfer of something less than the bankruptcy estate's entire rights in the property. Otherwise, the underlying purpose of Chapter 13 would not be served.

However, the district court, on appeal (hereinafter, *Fisher II*), rejected this *a priori* reasoning. Specifically, it rejected the bankruptcy court's premise in *Fisher* that Section 1306(a) and Section 1327(b) were irreconcilable. Rather, the district court concluded that "vest" as used in Section 1327(b) means nothing less than an absolute transfer of the bankruptcy estate's interest in property to the debtor.

> While protecting such funds may be salutary policy, the Bankruptcy Code does not, in defining what property is in the estate, distinguish between earnings and other property. Although the pertinent statutes are not crystal clear, we are still constrained by their text, which suggests to us the following interpretation: First, § 1306(a) defines "property of the estate" to include property and earnings acquired by the debtor after the case's commencement. While the case is pending, the post-petition property and earnings are added to the estate until confirmation, the event that triggers § 1327(b) and "vests" the property of the estate in the debtor. That is, the property interests comprising the pre-confirmation estate property are transferred to the debtor at confirmation, and this "vesting" is free and clear of the claims or interests of creditors provided

for by the plan, § 1327(b), (c). Finally, the property of the estate [sic] once again accumulates property by operation of § 1306(a) until the case is "closed, dismissed or converted."

*Fisher II*, 203 B.R. at 962.

I adopt the district court's reasoning in *Fisher II*. I, like that court, agree that much of what is supposedly irreconcilable between Section 1306(a) and Section 1327(b) is due to the mistaken conclusion by some courts that the Chapter 13 bankruptcy estate must cease to exist upon confirmation if all property then owned by the estate were transferred to the debtor at confirmation by operation of Section 1327(b). *See, e.g., In re Mason*, 51 B.R. 548, 550 (D.Or.1985) (court holding that "in accordance with 11 U.S.C. § 1327, the estate may cease to exist prior to the case being 'closed, dismissed or converted' when the plan so provides and the plan is confirmed") and *In re Stark*, 8 B.R. 233 (Bankr.N.D.Ohio 1981). As the Eighth Circuit observed in *Security Bank of Marshalltown*:

> **The estate can continue to exist as a legal entity after confirmation even if it holds no property.** Several sections of the bankruptcy code support our view that the estate continues to exist after confirmation. Section 1322(a)(1) provides for "supervision and control" by the trustee over monies and property of the estate committed to the plan. In addition, the trustee is authorized to deposit or invest money of the estate pursuant to 11 U.S.C. § 345, and 11 U.S.C. § 347(a) provides that the trustee shall stop payment on any unpaid checks 90 days after the final distribution and the remaining property of the estate is to be paid into the court. Section 704(9), made applicable to Chapter 13 by 11 U.S.C. § 1302(b)(1), requires the trustee to make a final report and file a final account of the "administration of the estate." Finally, 11 U.S.C. § 349(b)(3) states that unless the court orders otherwise, dismissal of a Chapter 13 case "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case." These sections support the position that the estate continues to exist after confirmation of a Chapter 13 plan.

*Security Bank of Marshalltown*, 1 F.3d at 690–91 (emphasis added).

■■■ Therefore, what had seemed to some courts as an unsurmountable obstacle to reconciling Section 1327(b) with Section 1306(a) if "vesting" was interpreted to mean a complete transfer of all interests belonging to the bankruptcy estate is in fact not an obstacle at all. The bankruptcy estate created at the inception of the Chapter 13 proceeding continues post-confirmation regardless of whether all of the pre-confirmation property held by that estate revests (*i.e.*, transfers back) to the debtor by operation of Section 1327(b).[13] Consequently, there always remains a bankruptcy estate to accept under Section 1306(a) whatever property the Chapter 13 debtor might acquire post-confirmation

---

**13.** There would appear at first blush to be an inconsistency between the effect of dismissal and the effect of confirmation upon the continuing existence of the bankruptcy estate. However, as *Security Bank of Marshalltown* points out, the viability of a bankruptcy estate is not dependent upon whether the estate is funded. Rather, its viability depends upon need. In the case of a Chapter 13 proceeding, post-confirmation continuation of the bankruptcy estate is necessary because Section 1306 makes it necessary. On the other hand, there is no need to continue the bankruptcy estate upon dismissal because its *raison d' être*, the proceeding itself, has terminated.

prior to the close, dismissal or conversion of the Chapter 13 case.[14]

One arguable flaw in the district court's analysis in *Fisher II* is that Section 1306(a) would also cause whatever has been transferred to the debtor by operation of Section 1327(b) to be automatically returned once again to the bankruptcy estate, thereby rendering Section 1327(b) meaningless. However, Section 1306(a) need not be read so broadly, for it limits the bankruptcy estate's post-confirmation accumulation of property to only that property which the debtor acquired post-confirmation. "Acquire" is a transitive verb whereas "vests," as used in Section 1327(b), is an intransitive verb. It is certainly plausible, then, to interpret "acquires" as used in Section 1306(a) as applying only to property actually procured by the debtor post-confirmation as opposed to property that has merely been returned to him by operation of Section 1327(b) or the plan itself.

*Security Bank of Marshalltown* is the third and final case relied upon by the court in *Kolenda* as support for its conclusion that vesting under Section 1327(b) means something less than an absolute transfer of rights from the bankruptcy estate to the debtor. However, *Security Bank of Marshalltown* for the most part relies upon *Aneiro* and therefore is subject to the same weaknesses as *Aneiro*.

Moreover, *Security Bank of Marshalltown*'s discussion regarding whether pre-confirmation property continues as property of the estate post-confirmation is dictum. The appeal in *Security Bank of Marshalltown* arose because the debtors, who were farmers, did not pay some of their post-confirmation creditors for debt incurred during the interval between confirmation and the conversion of their case to Chapter 7. The Chapter 7 trustee proposed paying these post-confirmation creditors first as administrative priority claimants. However, Security Bank, which held a pre-petition unsecured claim, objected because such treatment would exhaust the trustee's accounts before any distributions to unsecured non-priority claims could be made.

The only argument that Security Bank made with the bankruptcy court regarding the allowance of the post-confirmation

---

**14.** The bankruptcy court in *Fisher* perceived "an anomaly, repugnant to the rest of Chapter 13," if Section 1327(b) were interpreted to effect a complete transfer of all of the bankruptcy estate's property at the time of confirmation. *Fisher*, 198 B.R. at 733. The bankruptcy court's concern was that an unscrupulous debtor could take advantage of a Chapter 13 proceeding to dissipate substantial assets that otherwise would have been available for distribution to creditors by disposing of these "revested" assets post-confirmation while making only minimal plan payments and then converting the case to Chapter 7 once the dispositions had been made. In was the *Fisher* bankruptcy court's opinion that the debtor's ability to expropriate these assets post-confirmation in this fashion placed the bankruptcy estate's creditors too much at risk.

The concern raised by the bankruptcy court in *Fisher* is legitimate although one does wonder how frequently such an abuse might actually occur. Moreover, the bankruptcy estate and its creditors do have tools to combat such a problem. After all, vesting of the property in the debtor upon confirmation occurs only if the plan or the confirmation order do not provide otherwise. Therefore, a Chapter 13 trustee or another party in interest could easily thwart whatever designs a debtor might have to use the Chapter 13 process to dissipate valuable assets simply by demanding as part of the confirmation order that the assets remain as property of the estate post-confirmation and, therefore, subject to the court's continued supervision. Moreover, the debtor would not be immune from other remedies if in fact his decision to convert was in bad faith. For example, bad faith may in and of itself be sufficient to warrant dismissal of the Chapter 7 proceeding once the case has been converted. *In re Zick*, 931 F.2d 1124 (6th Cir.1991).

creditors' administrative claims was that the bankruptcy estate ceased to exist once the case was confirmed. Security Bank relied upon *In re Mason*, [45 B.R. 498, 500 (Bankr.D.Or.1984), *aff'd*, 51 B.R. 548, 550 (D.Or.1985)] and other similar cases for this proposition. Consequently, Security Bank contended that none of the post-confirmation expenses incurred by debtors were entitled to administrative priority because only "costs and expenses of preserving the estate" were entitled to such treatment. 11 U.S.C. § 503(b)(1).

The Eighth Circuit itself acknowledged that the issue on appeal was quite narrow. "The only issue before this court is whether the Chapter 13 estate existed after confirmation, which is when the debts were incurred." 1 F.3d at 689. Consequently, there was no need for the court to expound as it did on the separate issue of whether pre-confirmation property continued as property of the estate notwithstanding Section 1327(b). The Eighth Circuit's affirmation of the bankruptcy court's determination that the bankruptcy estate continued to exist post-confirmation was sufficient.[15]

In summary, Section 1327(b) and Section 1306(a) are reconcilable. As the district court in *Fisher II* concluded, property that had become property of the estate in a Chapter 13 proceeding either by operation of Section 541 or Section 1306 prior to confirmation will again become the debtor's property upon confirmation by operation of Section 1327(b) unless the plan or confirmation order provides otherwise. However, the bankruptcy estate will continue regardless of whether it is depleted of property at confirmation so that it will be available to serve as a receptacle under

---

15. *Kolenda* did not cite *Schewe v. Fairview Estates (In re Schewe)*, 94 B.R. 938 (Bankr. W.D.Mich.1989). However, *Schewe* is on point. Therefore, I am compelled to explain why I have elected not to follow it.

In *Schewe*, the debtor continued in possession of a mobile home lot post-confirmation that the debtor had occupied pre-petition under a month-to-month tenancy. The landlord then attempted to evict debtor because of alleged post-confirmation violations of the mobile home park's rules. The debtor responded by seeking an injunction against the landlord.

*Schewe* concluded that the debtor's leasehold interest remained property of the estate not withstanding the revesting caused by Section 1327(b) and that therefore the landlord's attempts to recover possession had violated the automatic stay. However, the court's analysis in *Schewe* is not particularly persuasive. Indeed, its conclusion appears to be driven more by considerations of policy than a supportable interpretation of the Bankruptcy Code.

> When a debtor is a wage earner, the continued further occupancy of his residential premises may be essential to earning his income and carrying out the terms of the debtor's confirmed plan.

*Id.* at 945 (citations omitted).

> Good sense and the intent of Chapter 13 dictate that the debtor should be protected by the stay during the *full course* of the rehabilitation process.

*Id.* at 946 (emphasis in original) (quoting from *Citicorp Homeowners, Inc. v. Willey (In re Willey)*, 24 B.R. 369, 373 (Bankr.E.D.Mich. 1982)).

Moreover, *Schewe* offers no explanation for why the inflexible rule it chose to read into the statutory language was necessary given that Congress had already provided the debtor in *Schewe* the continued protection of the automatic stay post-confirmation through the simple expediency of a plan provision. In other words, Mr. Schewe could have easily protected his leasehold interest from an unrestrained post-confirmation attack from his landlord by simply providing in his plan that the leasehold interest would continue as property of the estate post-confirmation notwithstanding Section 1327(b). *See*, 11 U.S.C. § 1322(b)(9). While the ruling in *Schewe* certainly rescued Mr. Schewe from his carelessness, that undeserved rescue was at the cost of denying many other debtors the opportunity to regain absolute control of their property post-petition so as to better effectuate their fresh start.

Section 1306 for debtor's post-confirmation acquisition of property. Granted, this resolution is not particularly elegant. However, it suffices.[16]

In the instant case, there is absolutely no question that Debtors' interest in the insurance proceeds is no longer property of the estate. Either that interest passed to Debtors by operation of Section 522($l$) when Ms. Van Stelle claimed the Malibu as exempt without objection or it passed to Debtors by operation of Section 1327(b) when their plan was confirmed. Hindsight, being perfect, suggests that Debtors should not have claimed an exemption in the Malibu, which, after all, Ms. Van Stelle valued at zero, and that they should have otherwise kept the insurance proceeds as part of the bankruptcy estate so that they could now utilize Sections 1303 and 363(b) to compel Chase Automotive to release its interest in the insurance proceeds and accept instead a new lien in a replacement vehicle. However, the reality is that Debtors did claim the Malibu as exempt and they themselves provided in their plan that the insurance proceeds associated with that vehicle otherwise transferred to (*i.e.*,

vested in) them when their plan was confirmed. Therefore, Debtors are not in a position to now use Section 363(b) to their advantage.

## CONCLUSION

Debtors have filed a motion to in effect use this court's order as a substitute for Chase Automotive's endorsement of the joint check from Debtors' insurer so that the same may be negotiated and the proceeds used in part to purchase a substitute vehicle for the Debtors. Debtors have correctly cited Sections 363(b) and (e) as the authority under which such relief can be granted. However, those sections are not applicable in this instance because they apply only with respect to property interests held by the bankruptcy estate and the property interest here, that being Debtors' insurance claim for the wrecked Malibu as now manifested in the form of a joint settlement check, is *no longer property of the bankruptcy estate* by operation of either Section 522($l$) or Section 1327(b).

Therefore, for the reasons stated in this opinion, Debtors' motion is denied.[17] The

**16.** It is tempting to interpret Section 1327(b) as also transferring from the bankruptcy estate whatever the bankruptcy estate acquires post-confirmation under Section 1306 unless the plan or confirmation order provides otherwise. *Cf. In re Ziegler*, 136 B.R. 497, 502 (Bankr.N.D.Ill.1992). In other words, Section 1327(b) would continue to operate post-confirmation as a filter of sorts by retaining from the debtor's post-confirmation earnings and acquisitions that have automatically become property of the estate by operation of Section 1306(a) whatever is to be administered by the Chapter 13 trustee under the plan or confirmation order before returning to the debtor for his unfettered enjoyment whatever remains. Certainly, such an interpretation answers the nagging question of how a debtor is to function post-confirmation under some semblance of routine when all of his or her post-confirmation earnings and acquisitions continue to become property of the estate pursuant to Section 1306(a) and, there-

fore, all of those earnings potentially became subject to the restrictions of Section 363. However, I refrain from taking this additional step because it is not necessary for purposes of resolving the issue immediately before me.

**17.** The denial of Debtors' motion leaves unanswered the separate question of what the Chapter 13 Trustee is to do with the joint check that Debtors' insurance company had delivered to her. I began this opinion by observing that a good place to start a bankruptcy analysis is often to first ask what would happen if no bankruptcy proceeding had ever been commenced. Such an approach suggests either interpleader or declaratory relief as a solution. In other words, the Chapter 13 Trustee might simply elect to return the check to the insurance carrier and then let the carrier either interplead the settlement amount with a court of competent jurisdiction or leave it to Debtors and/or

court will enter a separate order consistent with this opinion.

Chase Automotive to commence the appropriate action for declaratory relief.